Thank you, Your Honor, and may it please the Court. Graham White for the United States It is settled law that the False Claims Act authorizes relators to recover the proceeds of the claims they allege. That is how the statute achieves the delicate balance of rewarding relators who expose fraud against the government by bringing meritorious ketam claims, while ensuring that those who Section 3730 provides that when the government intervenes in the relator's case and settles the relator's claim, the relator may recover a share of the proceeds. Courts determine whether the government settled the relator's claim by applying the factual overlap test. The test requires courts to compare the allegations in the complaint with the conduct covered by the settlement agreement, and factual overlap exists if the court finds that the relator alleged the same violation of the False Claims Act that is contemplated by the settlement agreement. Robert R. Reilly Counselor, let me ask you a threshold question since we're talking about a relator, the definition of a relator. Was there any argument made in the district court, or here for that matter, that Mr. Conyers was not an original source, or does the government concede that he was an original source but that there's no factual overlap? I would preface that by saying, let me add on to the question, it seems as though the government had knowledge of the things that are part of the complaint, what was filed in court by Mr. Conyers, the government had some knowledge of that prior. Is that not correct? That is correct. So the government, and I'm happy to provide a fuller explanation if it would be helpful to the court. Well, I was just wondering whether he's truly a relator, not whether, again, I'm wondering that, but my question is, was it brought, was it raised as an issue for the district court to consider? Only insofar as the relator attempted to recover the share of it, recover proceeds with respect to the allegations involving Jeff Mazon, Stephen Siemens, because there was no dispute that in the relator's initial complaint that those two individuals and their kickback schemes were not in the complaint. And so we only raised the original source issue insofar as, even if the relator had alleged those two schemes, the relator could not recover because he wasn't an original source of those claims. And so in terms of whether the relator is actually a relator for the purposes of the statute, he did initiate this action under subsection B1. And so I think that's as far as we would say about that. But I would say to just provide, put a finer point on Your Honor's question that the government did learn about the fraudulent schemes that settled well before the relator brought this action. I'm happy to discuss more in detail. Well, it just seems like the government conceded by taking the position that we're not going to intervene, we're not going to intervene in what he filed, but we are going to intervene with new claims that are ours and only ours, only the government's claims. So now you've commingled the claims and sort of stepped into the overlapping facts rather than just saying, he's not a relator, he's not entitled to anything if he's not a relator, if he's not an original source. It seems like there's some disconnect there and that the government conceded or waived the argument that he's not a relator. No, so just to be clear, so when the government intervened in this case, we did proceed with two of the relator's claims, right? Two of the relator's claims included the claim that the KBR had improperly used mortuary trucks to supply perishable items to U.S. troops. And there was a second claim about defective vehicles that the KBR was billing the government for. So when the government initially intervened in this case, its amended complaint alleged those two claims, right? Ultimately, after the government proceeded with the case, and I should say, the government's amended complaint also added the additional claims, right, pertaining to the kickbacks for subcontracts fraud. Ultimately, the government interviewed the relator, investigated the relator's claims that it proceeded with, and decided not to proceed with those claims and only to proceed to trial on the claims that it added related to Barton, Sievis, and Mazon, right? At that point, the relator had a right under the statute to continue litigating his own claims further, chose not to. The only inquiry that matters under the statute in terms of the relator's right to recover is whether the government obtained proceeds that arise from the relator's claim. Now, the district court, as I mentioned, committed reversible error by failing to properly apply the factual overlap test. So as I mentioned earlier, the factual overlap test just requires a side-by-side comparison of the allegations and the complaint with the conduct discussed in the settlement agreement. The court began its factual overlap analysis by noting, quote, the conduct covered by the settlement agreement does not explicitly include the conduct that Mr. Conyers alleged. Now, that should have ended the matter because there has to be a factual overlap for the relator to recover. I don't mean to interrupt you, counsel, but when you talk about the factual overlap, do we have a, does the Fifth Circuit have a case using that test, the factual overlap test in a QI-TAM? I'm not aware of a case where the Fifth Circuit has applied the factual overlap test, but I would say that the Fifth Circuit has cited Bledsoe, which is where the Sixth Circuit's case in favorably in another context. That was in the University of California region's case. It was a little bit of a different context there. Right, yeah, because I'm looking at Sixth Circuit, I'm looking at 11th, 8th, en banc 8th Circuit. Right, and the First Circuit has also, and the D.C. Circuit have also cited favorably the factual overlap test as well. But just to tie it to the statute. Sure. Is your argument tied to the words of the statute in 3730 D.I.? Yes. Meaning Mr. Conyers would be entitled to receive a percentage of, quote, the proceeds of the action or settlement of the claim. Right. Okay. Sure. So, right, so the section, subsection D.I. entitles the relator to recover the proceeds of the action, meaning the action that the relator brought, or the claim. Now, Justice Alito. Well, settlement of the claim, right? And all we have here is settlement of the claim. That's right, and so that's how the 8th Circuit sort of distinguished between the two phrases in the real opinion. Yeah, because action is broader than claim. So I. Arguably. Arguably, I think we would dispute that, but ultimately, as the 8th Circuit pointed out, Your Honor, when you're talking about a settlement, the operative language is the proceeds of the settlement of the claim, and so in that respect, it's clear that the relator is entitled to recover the proceeds of the claim that they alleged, and so when we're talking about factual overlap, that's just how courts determine whether the government actually settled the claims. It's just a way for courts to say. That's why I just wanted to tie it up to the statute. Right, exactly. So it's just a way for courts to determine whether the claims are the same. So a straightforward application of the factual overlap test is all that the court needs to determine whether or not the claims are the same, and so that's what we're trying to do here.  All right, so we're going to move on to KBR, to support U.S. Army forces overseas during the War on Terror, and the settlement agreement asserted that former KBR employee Anthony Martin accepted kickbacks from a Kuwaiti company in exchange for awarding an inflated subcontract to that company, and so KBR then submitted false claims to the government, which included the cost of the inflated subcontract and the kickbacks that were paid to Mr. Martin. The agreement also settled related kickback claims involving two other employees that I mentioned earlier, Jeff Mazon and Stephen Siemens, who accepted kickbacks in exchange for awarding subcontracts for cleaning services and fuel tankers. That is not what the relator alleged in his complaint. The relator alleged a kickback scheme that was ultimately never proven. The relator alleged that after various subcontracts were awarded, other KBR employees took kickbacks in exchange for billing the government for trucks in Iraq and Kuwait, even if the trucks were defective or were never actually delivered as promised under the subcontract. Could the government have brought its claims separate from Mr. Conyers? Yes. Well, I'm curious. I know it took, it was about six years before the government intervened. Was there a particular reason to intervene in Mr. Conyers' KETAM case as opposed to bringing its own? Sure, so two responses to that, Judge Englehart. First, the reason it took some time to intervene is the government sought and obtained, without relator's objections, good cause extensions so that it could investigate the claims. Because these claims pertain to conduct in a war zone halfway across the world, so it took time for the government to investigate and determine whether, to what extent, the claims it wanted to bring in this case. Now, we intervened in this case because, as I mentioned at the outset, we initially did proceed with the relator's claims about defective vehicles and the improper use of mortuary trucks. We proceeded with those claims. We sought to obtain a recovery of those claims and ultimately determined, after investigating them further, that they were unfounded and did not want to pursue them. And so that's why, years before the government ultimately reached a settlement agreement, we notified the relator and the court that we were not pursuing these claims any further. So that is why we intervened in the relator's suit. Is there a case that would support your position that once the government intervened, it seems like the very definition of an intervention is that the intervening party has an interest, some type of factually related claim intertwined with the main demand, either part of the defense or part of the case that's being advanced by the plaintiff or, in this case, the relator. I'm trying to figure out, from your argument, how do you unring that bell that, no, we did intervene. However, the claims that we have are still factually unrelated or there is no overlap between what we intervened on and what he brought. You understand what I'm saying? I understand what you're saying. It's sort of commingled already, so we've got to be able to separate that and that's a difficult task. So unlike ordinary interventions, section 3731, which sets forth the procedures by which the government intervenes, allows the government to add its own claims and it does not state that the claims have to be related to the claims that the relator initially brought. It says that the government can add its own separate claims. I would also note that it's significant that when we're looking at subsection D1, which is what authorizes the relator to recover settlement proceeds here, Congress knew how, when it was drafting section 3730, to refer to the government's claims and did not do so when it was talking about what claims the government, excuse me, the relator can recover under D1. So subsection C5 talks about what happens when the government pursues its claims in an alternate remedy. Section 3731 that I just mentioned, which talks about when the government adds its claims to the case, those provisions are not mentioned in subsection D1. Subsection D1 is only talking about the action brought by the relator under subsection B1. So Congress knew how to refer to the government's claims. The government ultimately had a right to recover here. So before my colloquy with Judge Engelhardt, I was just talking about what allegations the relator ultimately did allege in his complaint. So the relator alleged to kickback scheme that, as I had mentioned, involved after various subcontracts were awarded, certain KBR employees were taking kickbacks in exchange for billing the government for broken vehicles or vehicles that were not actually delivered as promised. That is the extent of the kickback schemes alleged in the complaint. There are no allegations of any kickback schemes. So if I can summarize, I mean, just to keep straight of my mind, he alleged mortuary trucks, kickbacks for broken vehicles, and anything else, prostitutes? There was improper billing the government for the use of prostitutes. Those were the three claims, right? And so all Your Honor has to do is simply look at the page of the complaint talking about the kickback schemes. There are no other kickback allegations in the complaint. There are no allegations that, you know, there were pervasive, I think the relator uses in his brief, a pervasive kickback scheme that could arguably cover the conduct settled by the government. That is not what is in the relator's complaint, and it's also not what was discussed in the settlement agreement. The settlement agreement was not talking about, you know, some sweeping kickback scheme. It was a very narrow scheme involving the kickbacks for subcontracts with those three procurement employees, none of which were mentioned by the relator in the relator's complaint. Now I just want to mention, just touch upon quickly, the cross appeal, the arguments that relator is making in the cross appeal. So relator is arguing on cross appeal that the court should adopt a novel interpretation of the False Claims Act, which is that a relator's entitlement to settlement proceeds has nothing to do with the substance of the relator's allegations, and instead turns solely on whether the government intervenes in the case. So as we explained in our reply brief, no court has adopted this view of the statute, and the very cases that relator relies on for that entire... You should address the attorney's fees issue. Sure, yeah. May I finish my point and then turn it? Sure. Yeah. So I just wanted to say that the relator's view of the statute is totally inconsistent with this court's recognition in the Regents of California case that the statute evinces no intent to compensate relators who bring unfounded ketamine claims, whether the claims are legally or factually unfounded. So as to the attorney's fee issue, the district court's decision to order the government to pay the relator's attorney's fees is unprecedented. The government and the relator litigate on the same side of the V in ketamine suits, and the only statutory language that is necessary for the court to resolve this issue is the very last sentence of subsection D1. Subsection D1, the very last sentence, says the relator may recover attorney's fees, and all of such fees are recoverable from the defendant. Needless to say, the government is not the defendant in this case. They were litigating this case on the same side as the relator, and so as we explained in our brief, for a relator to recover attorney's fees from the government, the waiver of sovereign immunity has to be unequivocally clear. Here, the statutory text is very clear that a relator cannot recover attorney's fees from the government. Well, this came up sui sponte, so even Mr. Conyers didn't ask for the fees, or did he ask for Mr. Conyers did not ask for attorney's fees in his relator's share motion, and I believe the relator's share motion expressly, I forget exactly what the context was, but noted that attorney's fees were recoverable from the defendant, not from the government. That was in the relator's motion, but this was a sui sponte decision that's directly contrary to the statutory text, and so for that reason, we would urge the court to reverse the decision. I see my time has expired, so unless the balance of my time for rebuttal. Okay, thank you, sir. Alright, Mr. Grayson, you're up. May it please the court. This case began in 2003, not 2006, when Bud Conyers was in Iraq driving convoys. His convoys were blown up three times. The third time, it was so bad that his artificial leg fell off, and he had to limp away from the truck after he was attacked. In December of 2003, long before anything else happened in this case or any related case, Mr. Conyers reported to both the military and to KBR, his employer, which was part of Halliburton at the time, that there was a widespread fraud going on, and the fraud specifically was that subcontractors, under the Log Cab 3 contract, were bribing KBR officials. It turned out 36 of them were bribed, and he was the first one to report it. According to all the information we have in this case, including the government's own information, he was the first one to report that there were bribes and kickbacks on subcontracts under Log Cab 3. And that happened in December of 2003, when he left Iraq for Kuwait and then came home and had his leg replaced. The reason why KBR didn't replace his leg is because he had blown the whistle. They not only didn't replace his leg, but they also stole all of his goods, everything in his hooch. What happened after that is that KBR, in 2004, disclosed to the government that there were, in fact, kickbacks. That's the first time, after Mr. Conyers' disclosure, that the government learned about any of these kickbacks on any of these subcontracts under the Log Cab 3 contract. According to the record, the voluntary disclosure happened in early 2004. We know this because it's in KBR's 10-Qs and 10-Ks, filed with the SEC. Now, Mr. Conyers came back to the United States. He wasn't contacted by the government. He looked for an attorney. He found me. And in 2006, we filed a complaint that was, at that time, based entirely on his knowledge of what had happened. Now, in the meantime, the government had started to investigate. They ended up indicting four of the 36 subcontractor staff on KBR who had taken bribes and inflated bills to the government. And I wrote the complaint based upon what he told me, not based upon something else that had happened, not based upon public information about an This is starting on paragraph 35. One of Conyers' first bosses, Willie Dawson, one of the 36 subcontract managers under the Log Cab contract, which Conyers first reported, took kickbacks from leasing companies for trailers, trucks, and equipment. Paragraph 37. The cost of the kickbacks incorporated in the leasing company's bill to KBR and KBR's bill to the government. In addition, because of the billing for the inoperative vehicles, the leasing companies billed approximately four times as much as the bill would have been for operative vehicles, and thus, in turn, increased KBR's bill to the government. Moreover, the arrangement caused unnecessary repair bills to be submitted to the government. Furthermore, the resulting inefficiency meant that the overall cost of the mission was increased. That's the fraudulent scheme that all 36 of the KBR subcontractor managers were guilty of. Mr. Grayson, did the government settle any of the claims in the complaint that you brought? Yes. Look at the settlement agreements. Well, I have. Which ones did the government settle that you brought on behalf of Mr. Conyers? Well, let's talk about what a claim means. Under the statute, the claims refer to the claims submitted by KBR. Okay. Well, the statute says 3730 D1. A private person is entitled to receive a percentage of, quote, the proceeds of the action or settlement of the claim. Right. Okay. So that's the settlement. Now, the claims there, and by the way, Judge Stewart has written about this, the claims there refer to the claims that KBR submitted under the LODCAP III contract. Those are the ones that were settled. There seems to be some sort of misunderstanding on the part of the government in that regard. They're referring to Claim 1, Claim 2, Claim 3 under the – that's not what that means. The term claim is defined in the same statute under the canon of construction that is involved here. Okay. So what does proceeds of the action refer to? Proceeds of the action includes the entire settlement. Now, let me explain that further. The term claim is defined at 31 U.S.C. section 3729 B2A, and that refers to KBR's claims for monetary recovery from government. They're billing to the government, if you will. Judge Stewart said the statute attaches liability not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment. That's Judge Stewart's decision in the Lange case, 575 F. 3rd 458. And then we have the prior formulation of this statute in 1943, which says that the payment to the relator comes out of the proceeds of such suit – that word was later changed from suit to action – out of the proceeds of such suit or any settlement of any claim involved therein. Any settlement of any claim involved therein. So in 1943, when this language was established, and again, according to the canon of construction, that matters. In 1943, what they were doing is putting their arms around all the money they could and saying that the relator gets 15 to 25 percent of the proceeds of such suit or any settlement of any claim involved therein. Well, you have a suit, and the suit is of claims. You have claims in the suit. Yes, but – Towards whatever. Right. In fact, the – You can settle Claim 1, Claim 2, but you're not going to settle Claim 3. Right? Isn't that how it works? No, because you're looking at the proceeds of the action, not the proceeds of the complaint. Okay? Now, the government didn't intervene. And by the way, the government did file a separate lawsuit regarding some of these things. Whether that's relevant to this case is being determined by the district court at this point. But what the government did is the government said, we intervene in their press release. In their press release, they said, we are intervening in the claims that were asserted by the Swiss of Lower, and those claims were the following. They were the claims submitted under the log cap contract by KBR regarding its work in Iraq and in Kuwait that were inflated by bribery and kickbacks, which is exactly what Mr. Conyers claimed. So, Mr. White, for the government, refers to the factual overlap test that some other circuits have applied, Eighth Circuit, Sixth Circuit, some others. Is that sort of a test that you would embrace as well for understanding whether your client should be entitled to some of the proceeds? Not in this context. And the reason why, well, for instance, the Sixth Circuit case says that the only way that you reject giving the full percentage to the relator is if there is absolutely no overlap. Okay? The Sixth Circuit didn't say you have to have what amounts to a mini-trial in order to determine overlap. It did say if there is no overlap whatsoever, then the relator doesn't get anything. That's not the case here. Okay, so how do we know whether there is overlap or not? Because it's the same contract, it's the same claims that were submitted by the same company in the same area for the same fraud. Okay, so I heard discussion of mortuary trucks. Yes. That was an allegation in the lawsuit that you brought on behalf of Mr. Conyers, right? Right. Okay, so was that claim settled? Yes, Mr. Conyers released that as part of the settlement agreement. So was it $14 million? Is part of the $14 million for settlement of the mortuary truck claim? Yes, I would say so. Okay, where would I look to see that? In the settlement agreement, in paragraph 6. Paragraph 6 of the settlement agreement. Right. And by the way, that's why this is different from both the Eighth Circuit case and the Sixth Circuit case. Neither one of them involved a release by the relator. In this case, the relator's claims were released in the settlement agreement. That's a pretty fundamental difference. All right, so let me turn for a moment to have a question, as Judge Duncan has put it, of how do you read a statute? How do you read a statute? We start with the role of history, as Judge Stewart has said. Well, shouldn't we start with the words? Yes, let's start with the words. Absolutely, let's start with the words. The words are, thank you, I am a textualist. Well, I mean, I don't know if I'm a textualist or not, but words are. I'm looking at them right here, so let's start with those. Okay, so the relator sees at least 15%, but not more than 25% of the proceeds of the action, or we have the word or there, or settlement of the claim, okay? Now, with regard to the proceeds of the action, there's no doubt that the settlement agreement is a proceed of the action. I mean, how can anybody say otherwise? Why are they settling? They're settling the action. Well, I guess, I don't know, just thinking out loud, if it goes to decision, then the proceeds of the action, there's a verdict, or I don't know if you get a jury trial on this, but the verdict, $40 million, that's the proceeds of the action. On the other hand, if you settle the claim, then we'll look at the settlement. I don't think so. I think that according to the 43 version of this, the proceeds of the action include any settlement that involves settlement of the action. What about the version of the statute that's currently in force? Okay, it says or. That's right, it says or. It says or. Right, so we qualify under both, but I'm saying we qualify under the first one. It shouldn't be swept away. The $13 million proceeds of the settlement agreement are proceeds of the action. The settlement agreement released the action or part of it. So it's a proceed of the action because the release was of the action. Now, settlement of the claim refers to the scenario where the action is not ended, but the claim is settled, so it could be an interlocutory settlement. The claim, as I indicated before, is defined by the statute as the claim submitted by KBR, and that's really a bedrock term. I mean, claim is as old as you get under the False Claims Act. And then we have the 1986 amendments, which, again, Judge Stewart has written about for the court, that the purpose of the 1986 amendments, which introduced the current language, was to increase the award offered to the key templates. That was the final purpose of the 1986 amendments, and the author of the 1986 amendments said the following. So let's stay with the statute. You don't have a lot of time, but nobody's disputing the purpose of the acts. We all know that. Well, respectfully, Your Honor, the author of the statute specifically resolved this question, this specific question. Even if he did, we're unlikely to resolve the case based on what he said. I mean, you can use your time however you want to. I'm going to use it to read two sentences from the legislative history. Go ahead. If the government comes into the case, the person, the relator, is guaranteed a minimum of 15% of the total recovery. Even if that person does nothing more than file the action in federal court, this is in the nature of finder's fee. The person need do no more than this to secure an entitlement to a minimum 15%. That's in the congressional record. Now, beyond that, we have the Vermont v. United States, X. Rel. Stevens case, Justice Scalia's case, in which he said that when you file a key tam case, what you're doing is you're setting up a contract between you and the government. And when the government intervenes, that becomes part of the contract and sets the terms of the contract. Is it 15% to 25% of the proceeds, or is it 25% to 30% of the proceeds? And what Justice Scalia wrote was that it's a finder's fee. A finder's fee doesn't involve anything after you've set it in motion. A bounty and an assignment, those are all the terms from the Supreme Court in Stevens that were adopted by this court, the Fifth Circuit, in the Babalola case, United States, X. Rel., Babalola v. Sharma. So where does that leave us in terms of my all-time favorite legal book, the Scalia and Garner Reading Law book? Canon 2, the words of a governing text are of paramount concern and that what they convey in their context is what the text means, as Judge Stewart pointed out. Canon 4, a textually permissive interpretation that furthers rather than obstructs the document's purpose should be favored. It obstructs the document's purpose, it obstructs the statute's purpose to force a mini-trial on all the parties and on the court to determine factual overlap. If there's any factual overlap, that's an imposition that undermines the purpose of the statute, which is to give a finder's fee to the relator. Canon 25, presumption of consistent usage. A word or phrase is presumed to bear the same meaning throughout a text. There is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. That's why I referred to the definition of claim. And as this court said in United States v. Bittner, a term generally used means the same thing each time it's used. Canon 27, the harmonious reading canon. The provisions of a text should be interpreted in a way that renders them compatible, not contradictory. We can't have contradictory meanings of the word claim in the statute. That would create chaos. Mr. Grayson, if I agreed with you, if the panel agreed with you, would we be in conflict with the en bloc 8 circuit in the relay case? No, because that case is different and distinguishable. In that case, for several reasons, and let me turn to that now. I'll just draw your attention to this language in the case. With respect to settlement 3732, one is clear that the relator's share is based only on proceeds of the claim. The use of indefinite article refers back to the claim that is brought by the relator in an action that he initiates. Well, that part, yes, that part is just wrong, Your Honor. But the case, that's just wrong. Well, no, I'm serious. I can't be responsible for the relator attorney's mess up in that case, but he didn't even point out apparently that the term claim is defined in the statute. Other circuits are wrong all the time. We're never wrong. The other circuits are wrong all the time. But I'm just saying sometimes we try not to get into conflict with the other circuits because then the Supremes have to get involved. Well, no, I'm not suggesting that because there is no conflict. That sentence is wrong. Okay, that sentence is wrong. But the rest of the decision is simply distinguishable. I mean, it has nothing to do. First of all, as I said before, the relators in that case did not settle their claims at all. In this case, in paragraph six of the settlement agreement, we settled our claims. So, I mean, the proceeds are involving in part our settlement of our claims. That wasn't true in the Sixth Circuit at all. Secondly, in the Sixth Circuit case, there was just a complete disconnect between the claims that were brought by the relator and what the government was even investigating. The claims that were brought by the relator had to do with when the contract was first negotiated, did the contractor deceive the government by misreporting their own costs in their proposal? That's what the relators were arguing. And, in other words, fraudulent inducement. They were arguing fraudulent inducement. And, in that case, the government never bothered to investigate that because it was nonsense. Instead, what the government investigated was whether they had been overcharged during the course of the contract, whether they'd been overcharged. So, complete disconnect between the relator's complaint and what the government investigated and found the defense liable for. And so your client signed off on the settlement in this case, regardless of what it, we can argue about what it included and didn't, but your client assented to and signed off on the settlement in this case? Did I understand you correctly? And, yes, and settled parts of his own claims. In other words, the consideration in this case is different from the consideration in either of the other two cases because it included my client's claims. So that's the fundamental difference. Now, let me go back, if I may, to… Well, you've only got six seconds, so… All right. I mean, there are six different legal issues in this case, Your Honor. I'd hate to think I'd lose an 18-year-old case. I started working on this when my last son was born. He's in college now. I'd hate to think I'd lose an 18-year-old case on account of not addressing one of those six issues. Well, I'll let you make a concluding statement, but I thought some would cut you off when you wanted to go down history and purpose, that you had waning time and a lot of ground to cover. But every lawyer can use their time the way they choose, and you did. So I'll allow you to make a concluding statement. The case is heavily briefed on both sides, and much of what we decide will be based on the brief. So make your concluding remarks, and then we'll hear back from the government. Okay. With the leave of the court, may I have three minutes to cover issues that haven't come up yet? You have what? May I have three minutes to cover it? No, sir. Okay. All right. All right. My concluding statement is that we didn't mention this, but the government's claim is untimely. The appeal was filed 95 days after the court's decision. The public disclosure argument that the government made is— Well, Mr. Grayson, I'm usually pretty lenient about these things, but I'm not giving you time to start adding new stuff. I was trying to allow you to make a concluding statement about that which you were talking about, but I don't want to give you leeway to start arguing things that were never raised. So with that, I'm going to determine you have a red light, you've written forcefully in your brief, and the brief's pretty much carried the day in these anyways. So we appreciate your advocacy in helping us understand the case. So we're going to hear back from the government and the rebuttal. Thank you very much, Your Honor. God bless you all. Thank you, sir. Mr. White, let me ask you before you get to where you are. With respect to the settlement, the district court picked its number and gave Mr. Conyers 25%, but at that point, at least from what I read, it doesn't seem to me that the government gave the district court any alternative or put forth some difference of thought about that and the government's claim about the percentage order came after he had done it. Is that accurate? So what the statute says is that the relator is entitled to a share between the 15% and 25% range based on the extent that they contribute to the government's recovery. We didn't propose an alternative percent to 25%, but what we did say in our brief is the same thing we're saying now, which is that the relator did not make any contribution to the government's recovery because, as I mentioned at the outset, while the government initially proceeded with the relator's claims, it dropped those claims a long time ago and only continued to litigate the claims that it successfully made. I would just note that the district court didn't hold that we had waived any argument about this. It just said when we're trying to pick a number, there was no number for the government, so we'll go with 25%. But, I mean, it heard your argument. Obviously, it didn't agree with you and moved on, and then he was left to pick his number, and he did, 20%. I just want to make sure my understanding of the record was clear. Go ahead. Thank you. So I just want to make a few additional points. First, there was a little bit of back and forth about whether the settlement agreement released any of the relator's claims. I think Judge Duncan, you had asked about this. The settlement agreement does not release any claims that the relator brought in this case, and we tried to make that abundantly clear in the agreement. I think it's paragraph 4 says that notwithstanding any other term in the agreement, KBR is not released from liability for any claim apart from the covered conduct. So the relator's claims, which are claims brought on behalf of the government related to defective trucks, to mortuary trailers, those are claims for which KBR is still liable. So it would be very strange for either the district court or this court to say that the settlement agreement was resolving claims for which KBR is still liable. Those claims were not released by the agreement. The second point I want to quickly make, I think Judge Duncan had asked, how do we know whether there's overlap? I think we explained in our brief, I think the most helpful case on this point is the Bledsoe case, which provides an example about the level of generality that you need to go into. I would just add that the test is really not that different from what this court uses in applying the first-to-file bar. So the first-to-file bar in Section 3730 says that when a relator brings an action, no other relator can bring a similar action based on the same essential facts, sent the same facts. And so what the court does is look at, you know, are we talking about the same fraudulent scheme? Are we talking about the same essential facts, even though there might be some minor differences? Both tests are just how the court figures out whether the claims are the same. Another point I wanted to mention, there was a little bit of confusion about what the word claim means in Section 3730. So in Section 3729, which a relator points out, claim is defined as a claim for payment. There's no dispute about that. But in Section 3730, we're talking about legal proceedings, and the word claim means a cause of action. The D.C. Circuit's opinion in Novo A.S., which we talk about in our brief, talks about this distinction and what claim means in the different sections. The word claim in Section 3730 is talking about a cause of action, and that's clear from the context in which it's used throughout the section. You know, the court can dismiss a claim. The government can proceed with the claim. It's talking about a cause of action, not a demand for payment. I also want to note, while this issue is not dispositive or relevant to the question of whether the government settled the relator's claim, the relator, again, is insisting that, you know, he filed this report in December 2003 that put the government on notice. I would just say, you know, whether or not the relator filed such a report, you know, the government has no record of it, but I can represent unequivocally to the court that that is not how the government's investigation into these kickback schemes started. KBR learned of fraudulent kickback activity in November 2003, proceeded to notify the government, and then that was what started the logjam investigation, and that's how the government uncovered the schemes into Martin Siemens and Maison. And then I guess the last point I would want to make, just to conclude, unless the court has any questions about anything I've said, is that I just want to emphasize that the government is not seeking a ruling here that would somehow prevent relators with meritorious QITAM claims from recovering what they're owed under the statute. The government is in a partnership with relators. The QITAM provisions of Section 3730 are the cornerstone of the False Claims Act, and we cannot effectively enforce the statute without the public's assistance. All we're asking for is that the court follow its sister circuits and apply the statutory incentive in the way it was meant to be, which is that relators can recover the proceeds of the claims that they allege. Unless the court has any other questions, I think I've hit the highlights. All right. Thank you, counsel.